CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

JUN 09 2020

JULIA C. DUDLEY, CLERK
BY: [signature]
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

IN THE MATTER OF THE SEARCH OF

**FACEBOOK USER ID: 100025092391434**

Case No. 3:20mj00026

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, John T. Pittman, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since April 1997. I am familiar with various investigative techniques, including surveillance, interviews and the execution of search and arrest warrants. Throughout my FBI career, I have conducted investigations relating to criminal street gangs, violent crimes, firearms, controlled substances, and other areas of law enforcement.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) (Distribution of a Controlled Substance) and Title 21, United States Code, Section 846 (Conspiracy to Distribute a Controlled Substance) have been committed by unknown person(s). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

**PROBABLE CAUSE**

5. In the early morning hours of April 4, 2020, deputies of the Greene County Sheriff's Office (GCSO) responded to a call for an unresponsive male ("Victim") at a residence. When deputies arrived at the residence, a male was administering CPR to the Victim. Deputies took over CPR until EMS arrived. EMS was advised by one of the deputies that the Victim was a known opioid user. Multiple doses of Narcan were administered to the Victim.

6. The Victim was taken to the University of Virginia Hospital, where he subsequently died on or about April 7, 2020.

7. While on scene deputies spoke with Witness One ("W-1"). W-1 advised he picked up the Victim after work at approximately 5:00pm on April 3, 2020, and brought the Victim to the residence. W-1 said they sat around and drank beer. At some point, the Victim got in a pickup truck parked outside the residence and fell asleep. W-1 checked on the Victim at approximately 3:15am and the Victim seemed to be sleeping. W-1 came back out about a half

hour later and noticed that the Victim was not breathing so W-1 called 911, removed the Victim from the truck and started CPR. Deputies asked W-1 if he saw the Victim use any kind of drugs; W-1 said no and that he only saw the Victim drinking. W-1 said he and the Victim had remained at the residence since W-1 picked the Victim up from work.

8. On or about April 24, 2020, Investigator Scott Murphy, GCSO, and I interviewed Witness Two ("W-2"). Among the information W-2 provided was the following:

a. W-2 spoke to a relative of W-1 after the Victim's death. This relative told W-2 the following:

   i. The relative woke up around midnight when W-1 came home.

   ii. W-1 told the relative that he could not wake up the Victim so W-1 and the relative went to check on the Victim who was in a truck.

   iii. W-1 and the relative continued to check on the Victim every ten minutes for three hours.

   iv. The relative wanted to call the rescue squad earlier but W-1 did not want the rescue squad at the house.

   v. When the Victim started gurgling and his chest was no longer going up and down, 911 was finally called.

9. On or about April 27, 2020, I interviewed Witness Three ("W-3"). Among the information W-3 provided was the following:

a. The Victim returned from a rehabilitation facility on or about March 29, 2020 after an approximate thirty-day stay for opioid addiction.

b. The night the Victim came home, he was relapsing and was back hanging out with W-1.

  c. The Victim overdosed on two previous occasions, once in October 2019 and once in February 2020.

10. Two cell phones belonging to the Victim were turned over to law enforcement. There was a folded piece of paper inside the case of one of the phones. This paper was also turned over to law enforcement and later field-tested positive for fentanyl.

11. I spoke with a GCSO Investigator who advised that he took pictures of a Facebook Messenger conversation between the Victim and Aaron PANNELL ("PANNELL") while physically viewing one of the Victim's phone. The conversation occurred on April 3, 2020 between approximately 10:28pm and 10:37pm. I reviewed the conversation and based on my experience it appears to be arranging a drug transaction. The conversation is as follows:

Victim: Hey buddy
Pannell: Yoo hook me up on sum bro
Victim: I got money I miss you
Pannell: How much man
Victim: Enoghy
Victim: Enough
Pannell: How much u give me man I won't bother u bro we be cool again
Pannell: U was my boy
Victim: Can we go get some
Pannell: Didn't u just get sum
Victim: None hardly
Pannell: Were u
Victim: Walmart
Victim: I'll give u the ice he gave me
Pannell: Stay there b dare n 3 mins
Victim: Ok
Pannell: Wat car u n
Pannell: ?
Pannell: wats your number bro

12. On or about May 27, 2020, I searched Facebook for Aaron Pannell. The profile picture for the user ID was the same as the picture next to Pannell's posting in the Facebook

Messenger conversation described in paragraph 11. Additionally, the user ID for this Facebook account was identified as **100025092391434**.

13. On or about May 28, 2020, Investigator Murphy, GCSO, served a preservation request of Facebook for the Facebook user ID **100025092391434.**

14. Based on my experience I know that people who sell or distribute controlled substances will use Facebook as a method of maintaining contact with their suppliers, customers and co-conspirators. They will use Facebook to send and receive messages, photographs, videos and other digital and electronic data that pertains to their drug trafficking activities.

15. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

17. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.

When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

24. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

27. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

29. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

32. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

33. Based on the foregoing, I request that the Court issue the proposed search warrant.

34. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

35. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**OATH**

The information in this affidavit it true to the best of my knowledge and belief.

Respectfully submitted,

*s/John T. Pittman*
John T. Pittman, Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this 9th day of June 2020.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE